

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN RE: HOOTEN FAMILY TRUST B ROBERT C. HOOTEN, | § | No. 08-23-00327-CV |
| Appellant, | § | Appeal from the |
| v. | § | 37th Judicial District Court |
| MARSHA ELLEN COLLINS, TRUSTEE OF THE HOOTEN FAMILY TRUST B, | § | of Bexar County, Texas |
| | § | (TC# 2023CI09678) |
| Appellee. | | |

**<u>MEMORANDUM OPINION</u>**

This trust case requires us to revisit the law of personal jurisdiction—here as it applies to whether Texas has personal jurisdiction over a trust beneficiary who lives in Indonesia. The dispute is set in the all-too-common fact pattern of family members fighting over inherited assets. After much disagreement and vitriol exchanged between the sibling beneficiaries, Appellee Marsha Ellen Collins, as trustee and beneficiary of the Hooten Family Trust B, filed a declaratory action in Bexar County, naming her brother Robert Hooten as a defendant.[1] Robert, a resident of Indonesia, filed a special appearance, which the trial court denied. He now appeals, arguing the

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

court's implied findings supporting jurisdiction are legally insufficient, and therefore, it lacks personal jurisdiction over him. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Marsha Ellen Collins, a California resident, is the successor trustee of the Hooten Family Trust B. She and her brother, Robert, are named beneficiaries of this trust. The trust agreement was executed in California by Marsha's and Robert's parents, John and Janet Hooten. Upon Janet Hooten's death, the trust was administered by John as trustee for his own benefit during his lifetime. The trust was first administered in California for 17 years. John then moved to Texas, where he administered the trust for roughly two decades until his death in 2022. While living in Texas, John hired Investar, a Texas-based property management company, to help manage the trust property. He also relied on a Texas-based CPA firm, J. M. Trippon & Company, CPAs, to help administer the trust and advised on related tax matters. At the time of John's death, the trust held 21 income-producing real properties in Texas and a vacant lot in California.

The terms of the trust granted a limited power of appointment to the surviving trustor to dispose of the remaining assets in Trust B by will at the survivor's death. As the surviving trustor, John's will included an election to distribute the remaining assets in equal amounts to Robert and Marsha.

This litigation arose when Marsha and Robert disagreed how to divide Trust B's assets between them. Robert became dissatisfied with Marsha's performance as trustee in administering the trust. Following John's death, the trust sold 11 of the Texas properties, and two were under contract; the trust still held nine remaining properties. One valuation placed the fair market value of the remaining Texas properties at $37,790,000. By February 2023, Robert was demanding an immediate distribution of cash, a distribution of monthly operating income, and a negotiated

2

agreement to distribute the remaining trust assets. His communication of those demands mentioned his attorneys were "anxious to litigate" both Marsha's and his deceased father's actions as trustees.

When no agreement was reached, Marsha initiated an action in the district court of Bexar County, naming Robert (among other necessary parties) as a defendant in both his individual capacity and in his capacity as a beneficiary, and seeking a declaratory judgment: (1) approving her actions as the trustee in the administration of the trust, (2) approving an accounting of the trust, (3) approving a plan to distribute the trust assets, (4) approving compensation to be paid to her as trustee, and (5) construing provisions of the trust agreement and her father's will. The original petition alleged that Robert was subject to jurisdiction based on the Texas Trust Code. *See* Tex. Prop. Code Ann. § 115.001 ("[A] district court has original and exclusive jurisdiction over all proceedings by or against a trustee and all proceedings concerning trusts . . .").

Robert filed a special appearance. Marsha responded with two amended petitions, the second of which asserts that the court has *in rem* jurisdiction over the dispute, but in any event the court has personal jurisdiction over Robert based on his contacts with Texas (including owning properties, receiving a continuous income stream from Texas, using Texas addresses, using Texas professionals for tax reporting and asset management, acting as trustee over a Texas trust, traveling to Texas to, request and receive information on the trust; and engaging in negotiations over its distribution).

Aside from the parties' pleaded allegations, we have the following proofs in the record from Robert. The record includes his affidavit stating: he has been a resident of Indonesia since 2009; he has never maintained a place of business in Texas, employed Texas employees, or conducted business in Texas; he has never been a party to a Texas lawsuit; and he never owned or invested in real or personal Texas property in his individual capacity. As to Trust B, he claimed he

3

has never had any involvement in the trust's business activities, including acquiring the trust's properties. He claims the location of the trust's properties is immaterial to him and was actually fortuitous, as the purchase of Texas property resulted from the actions and decisions of others. Finally, aside from seeking trust distributions to which he was entitled as a beneficiary, Robert denied ever seeking a profit, benefit, or advantage from any Hooten B trust property.

Marsha's response to Robert's special appearance included a 3,000-page appendix. According to Marsha, the documents evidence what she believes establishes the court's general and specific jurisdiction over Robert. For example, the evidence purportedly shows Robert had systematic and continuous contacts with Texas for several years, and that he directed communications to Texas-based professionals concerning the trust property and requested information about the assets, visited Texas and engaged in meetings concerning the trust assets, negotiated an equitable distribution of the property, and received distributions from the trust.

The trial court denied Robert's special appearance. Robert moved for reconsideration, urging the court to find that it lacked personal jurisdiction over him based on an intervening Fourth Court of Appeals decision. *McLean v. Paradigm SRP LLC*, No. 04-22-00449-CV, 2023 WL 7133438 (Tex. App.—San Antonio Oct. 31, 2023, no pet.) (mem. op.) (concluding court lacked personal jurisdiction over seller of military tank to Texas resident). That motion was also denied. On appeal, Robert argues the trial court erred in denying his special appearance and motion for reconsideration because it lacks both general and specific jurisdiction over him. As part of that challenge, he contends that no legally sufficient evidence supports the court's implied findings of jurisdiction. For the reasons discussed below, we affirm.

4

## II. FRAMEWORK FOR OUR REVIEW

### A. Standard of review

As confirmed by the Texas Supreme Court, whether a court has personal jurisdiction over a defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). To resolve the question of law, however, a trial court must often resolve questions of fact. *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). When the parties agree on the relevant facts, our review is purely de novo. *See id.* But if the parties disagree over the facts, we must look to what the trial court found. When, as here, a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, we imply all facts necessary to support the ruling that are supported by the evidence. *Marchand*, 83 S.W.3d at 795; *In re E.S.*, 304 S.W.3d 571, 574 (Tex. App.—El Paso 2010, pet. denied). A party can challenge any of the implied findings under traditional legal and factual sufficiency review standards. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam). Robert limits his challenge to legal sufficiency.

When examining a legal sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to find the fact under review. *Id.* A legal-sufficiency challenge will be sustained if the record reveals that evidence offered to prove a vital fact is no more than a scintilla. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014).

## B. The procedural framework

When deciding whether a nonresident defendant is subject to jurisdiction, we first determine whether the plaintiff pleaded sufficient jurisdictional facts under the Texas long-arm statute. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013) (citing Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2)). If that initial burden is met, the burden shifts to the defendant to negate all potential bases for personal jurisdiction the plaintiff pleaded. *Id*. A nonresident defendant may negate jurisdiction on either a factual or legal basis. *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. *Id*. The burden then shifts back to the plaintiff to respond with evidence that affirms its allegations. *Id*. Even if the plaintiff's alleged facts are true, the defendant can demonstrate that the evidence cannot legally support jurisdiction because (1) the defendant's contacts with Texas fall short of the "purposeful availment" requirement; (2) for specific jurisdiction, the claims do not arise from the contacts; or (3) traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. *Id*. We are required to analyze specific jurisdiction on a claim-by-claim basis unless all claims arise from the same contacts with Texas.[2] *Moncrief Oil Intern. Inc.*, 414 S.W.3d at 150.

## C. The three avenues for jurisdiction

Personal jurisdiction can be either "general" or "specific." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8 & 9 (1984); *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996). General (or all-purpose) jurisdiction describes a defendant with contacts so continuous and systematic "as to render [it] essentially at home in the forum State." *Goodyear*

---

[2] The parties here do not make claim-specific arguments for personal jurisdiction one way or another, and it appears that all of the claims for declaratory relief stem from the same set of contacts. We therefore conduct a singular analysis of personal jurisdiction for all the claims Marsha asserts in her petition.

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Id*. at 924; *Gaddy v. Fenenbock*, 652 S.W.3d 860, 868 (Tex. App.—El Paso 2022, no pet.) (discussing "at home" paradigm as it applies to individual trust beneficiary). Personal jurisdiction, as we also describe below, requires some "purposeful availment" with the forum that creates a "a substantial connection" with the forum state and the underlying controversy. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985); *Daimler AG v. Bauman*, 571 U.S. 117, 138–39 (2014).

Texas also recognizes a less common basis for jurisdiction: *in rem* and *quasi in rem* proceedings. *City of Conroe v. San Jacinto River Auth.*, 602 S.W.3d 444, 457–58 (Tex. 2020). We start our analysis there.

## III. ANALYSIS

### A. Marsha's argument for *In Rem* Jurisdiction

More than a century ago, the U.S. Supreme Court distinguished between *in personam* and *in rem* jurisdiction for state-court jurisdictional inquiries. *Pennoyer v. Neff*, 95 U.S.714 (1877). As later explained in *Shaffer v. Heitner*, 433 U.S. 186, 189 (1977):

> If a court's jurisdiction is based on its authority over the defendant's person, the action and judgment are denominated "in personam" and can impose a personal obligation on the defendant in favor of the plaintiff. If jurisdiction is based on the court's power over property within its territory, the action is called "in rem" or "quasi in rem."

*Id*. at 199. Consequently, the jurisdictional analysis following *Pennoyer* centered on the physical— and in some cases constructive—presence of people and things within the forum state. *Id*. at 201–03. Texas courts acknowledge the same distinction: "The general rule of *in rem* jurisdiction is that the court's jurisdiction is dependent on the court's control over the defendant *res.*" *Costello v. State*, 774 S.W.2d 722, 723 (Tex. App.—Corpus Christi 1989, writ denied). "[A]n *in rem* action

7

affects the interests of all persons in the world in the thing," but an *in rem* judgment's effect is limited only "to the property that supports jurisdiction." *Bodine v. Webb*, 992 S.W.2d 672, 676 (Tex. App.—Austin 1999, pet. denied). For that reason, the "court need not acquire jurisdiction over the person." *City of Conroe*, 602 S.W.3d at 457–58 (citing *Batjer v. Roberts*, 148 S.W. 841, 842 (Tex. App.—El Paso 1912, writ ref'd)) (observing that service of process in *in rem* suits may be constructive, and persons with interest *in rem* may never know of suit).

Robert argues that this is not a true *in rem* action because it is not a suit against the property. We agree that the claim here would be better described as *quasi in rem*:

> A *quasi in rem* proceeding is an action between parties where the object is to reach and dispose of property owned by them or of some interest therein. While an *in rem* action affects the interests of all persons in the world in the thing, a *quasi in rem* action affects only the interests of particular persons in the thing.

*Bodine*, 992 S.W.2d at 676 (internal citations omitted); *see also Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958) ("A judgement quasi in rem affects the interest of particular persons in designated property.").

Drawing on these principles, Marsha contends that the court need not have *in personam* jurisdiction over Robert because Texas has *in rem* jurisdiction over the trust property. Robert disagrees with Marsha's characterization of the claims and argues that, even if the location of property provides part of the alleged jurisdictional basis, a Texas court must still have *in personam* jurisdiction over him. In this respect, we agree with Robert that developments since *Pennoyer* have cemented due process protections into both *in personam* and *in rem* jurisdictional inquiries.

In *Shaffer v. Heitner*, the Court was asked to decide whether the seizure of property in the forum state could justify a court's exercise of jurisdiction over nonresident defendants in a suit unrelated to the ownership of that property. *Shaffer*, 433 U.S. at 189. The Court traced the constitutional doctrine of state-court jurisdiction to *Pennoyer v. Neff. See Shaffer*, 433 U.S. at 196.

8

But the *Schaffer* Court recognized the watershed change occasioned by *International Shoe*. *Id.* at 203 (citing *Int'l Shoe Co. v. State of Washington, Off. of Unemployment Comp. and Placement*, 326 U.S. 310, 316 (1945)). After *International Shoe*, the focus of the personal jurisdictional inquiry changed from a state's sovereignty over persons within its border to the "relationship among the defendant, the forum, and the litigation." *Id.* at 204.

The *Shaffer* Court then reasoned that an assertion of jurisdiction over property is equivalent to an assertion of jurisdiction over a person's interest in that property. It dispensed with the theoretical distinction between *in rem* and *in personam* jurisdiction and concluded that all assertions of personal jurisdiction — whether based on property ownership (i.e., "*in rem*" or "quasi *in rem*") or personal contacts with the forum (i.e., "*in personam*") — are to be measured against the minimum-contacts and fairness prongs of the *International Shoe* test.[3] *Id.* at 212 ("We therefore conclude that all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny.").

Several Texas courts have resolved challenges to personal jurisdiction in trust litigation where the trust *res* included Texas real property; each conducted a thorough minimum-contacts tests analyzing the defendant's contacts with the state. *See Johnson v. Kindred*, 285 S.W.3d 895, 899 (Tex. App.—Dallas 2009, no pet.); *Alexander v. Marshall*, No. 14-18-00425-CV, 2021 WL 970760, at *5 (Tex. App.—Houston [14th Dist.] Mar. 16, 2021, pet. denied) (mem. op.); *JPMorgan Chase Bank, N.A. v. Campbell*, No. 09-20-00161-CV, 2021 WL 2583573, at *5

---

[3] Some authority suggests that *Shaffer's* holding applies primarily to *quasi in rem* cases. *See Brent v. Amaru Entm't, Inc.*, No. 3:22-CV-1281-B, 2023 WL 2169906, at *3 (N.D. Tex. Feb. 22, 2023) (mem. op.) ("To be sure, despite *Shaffer's* apparent breadth, *in rem* jurisdiction over property—without a minimum contacts analysis—may be appropriate in certain cases.") (citing *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 630 (1990)). Still, courts recognize that *Shaffer* requires all assertions of personal jurisdiction to satisfy due process requirements. *Id.* Yet, because this case more closely aligns to a *quasi in rem* action, the distinction if it exists, does not change our view here.

(Tex. App.—Beaumont June 24, 2021, no pet.) (mem. op.). Similarly, we must determine whether Texas has personal jurisdiction over Robert based on a detailed analysis of his alleged forum contacts and the relationship between those Texas contacts and the litigation. *See Dawson-Austin v. Austin*, 968 S.W.2d 319, 327 (Tex. 1998) (conducting a minimum-contacts analysis in a divorce case relating to the distribution of Texas property that was part of the marital estate); *see also Smith v. Lanier*, 998 S.W.2d 324, 333 (Tex. App.—Austin 1999, pet. denied) (conducting separate minimum-contacts analyses to determine the character of an estate's property—i.e., separate or community—and to determine the propriety of jurisdiction over the nonresident representative of the deceased's estate in her individual capacity). We thus turn to the minimum-contacts analysis next.

## B. Personal jurisdiction

We begin by evaluating Marsha's assertion of specific jurisdiction. And because we find there is specific jurisdiction over Robert in this case, we do not consider the question of general jurisdiction.

### (1) Controlling law

The Texas long-arm statute extends a Texas court's personal jurisdiction "as far as the federal constitutional requirements of due process will permit," but no further. *U-Anchor Advert., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977) (discussing prior version of Texas long-arm statute); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (stating that a court's jurisdiction is also limited by the Due Process Clause of the United States Constitution). Thus, the contours of federal due process guide our decision.

Federal due process limits a court's jurisdiction over nonresident defendants unless: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of

10

jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co.*, 326 U.S. at 316. "As a general rule, the exercise of judicial power is not lawful unless the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 877,(2011) (quoting *Hanson*, 357 U.S. at 253); *see Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) ("For half a century, the touchstone of jurisdictional due process has been 'purposeful availment.'"). Due process requires purposeful availment because personal jurisdiction "is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Michiana*, 168 S.W.3d at 785.

Purposeful availment includes deliberately engaging in significant activities within a state or creating continuing obligations with residents of the forum. *Burger King*, 471 U.S. at 475–76. It includes seeking profit, benefits, or advantage from the forum. *Michiana*, 168 S.W.3d at 785. It excludes, however, "random," "fortuitous," or "attenuated" contacts or the "unilateral activity of another party or a third person." *Burger King Corp.*, 471 U.S. at 475; *Michiana*, 168 S.W.3d at 790 ("[M]inimum-contacts analysis focuses solely on the actions and reasonable expectations of the defendant.") (internal quotation marks omitted). Moreover, a party may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there. *Moki Mac*, 221 S.W.3d at 575.

A plaintiff asserting that a court has specific jurisdiction over a nonresident defendant must also show that its claim arises out of, or relates to, the defendant's contacts with the forum. *See Helicopteros*, 466 U.S. at 414 n. 8; *see also Moki Mac*, 221 S.W.3d at 579 ("The 'arise from or relate to' requirement lies at the heart of specific jurisdiction by defining the required nexus

11

between the nonresident defendant, the litigation, and the forum.") Under the Texas application of that requirement, "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. Specific jurisdiction is not as exacting as general jurisdiction in that the contacts may be more sporadic or isolated so long as the cause of action arises out of those contacts. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (citation omitted).

### (2)  The parties' positions

The nub of this case is whether Robert successfully negated all bases of jurisdiction by showing that Marsha's evidence amounts to no-evidence of purposeful contacts with Texas. *See Kelly*, 301 S.W.3d at 659. We thus first turn to the allegations.

Marsha's pleadings and her response to the special appearance focus on four kinds of specific jurisdiction contacts that Robert has with Texas.[4] First, following his father's death, Robert traveled to Texas and participated in two meetings with Marsha and Texas-based professionals to discuss the status and management of the 21 Texas properties in Trust B. He asked for financial information (including five years of detailed annual income and expense reports for each Texas property and other loan documents) from the property management company Investar. Second, during the 18 months of the trust administration before suit was filed, Robert directed

---

[4] To be clear, much of Marsha's brief is devoted to her argument that Robert is subject to general jurisdiction in Texas. *See Gaddy v. Fenenbock*, 652 S.W.3d 860, 868 (Tex. App.—El Paso 2022, no pet.) (discussing general jurisdiction law as it might apply to out-of-state trust beneficiary). For that claim, Marsha focuses on several other claimed Texas contacts, including: (1) Robert's role as trustee and beneficiary of the RCH Trust, an entirely different trust that held Texas property; (2) almost all of Robert's income comes from Texas, which has included millions of dollars from the sale of or income flow from Texas property; (3) Robert's use of Texas bank accounts to hold RCH Trust income from which he pays personal expenses; and (4) Robert's ownership of other real property in Texas. We note, but do not rely on, these contacts because, for specific jurisdiction, the contacts must have a nexus with the cause of actions asserted, which is not argued here.

communications to the Texas professionals requesting information about the Trust B assets. Robert was receiving monthly financials and other information about the Trust B properties from Investar. Third, while Marsha served as trustee, Robert received distributions from the trust, which were generated by Texas properties with cash flow running through Texas intermediaries. Marsha demonstrated that Robert was receiving distributions from Trust B as properties were sold—for example, one distribution in the amount of $600,000 and another in the amount of $3,000,000. Fourth, Robert actively asserted himself into the management of the trust. Marsha alleges that Robert wavered in his ideas for how the property should be distributed and made irrational demands regarding the trust's administration. He sent communications demanding that certain Texas properties be distributed to him. Robert made offers on the properties he desired and requested that he and Marsha enter binding arbitration immediately if Marsha was not amenable to his proposed distribution of the Texas properties.

Robert responds to each of these allegations. His brief trip to Texas in 2022 was largely to attend his father's funeral, and his participation in the two meetings was merely fortuitous. Robert also argues Marsha failed to show that, by having these two meetings during his time in Texas, Robert sought to gain a benefit, profit, or advantage from the Texas forum.

While not denying his communications with the Texas professionals who managed the properties and assisted with the trust, Robert argues that a nonresident defendant's communications with individuals in Texas do not provide a legally sufficient basis for personal jurisdiction. He claims that Marsha's evidence incorrectly focuses on the volume of emails that Robert sent to and received from Texas-based individuals while he was in Indonesia. Additionally, he highlights that any communication he received was not a purposeful contact attributable to him because it was made by third parties.

13

While Robert admits to having received financial benefits from Trust B's Texas assets, he argues that those are legally insufficient to find he is subject to personal jurisdiction in Texas. Any benefits resulted from the unilateral acts of third parties. And he contends Marsha has failed to allege that any of her claims arose from these receipts.

Finally, Robert argues that the fact that Trust B was administered in Texas with the help of Texas-based professionals is a legally insufficient basis to find he is subject to personal jurisdiction in Texas. As a passive beneficiary, the location of the property and the administration of the trust were outside of his control, and he never decided on the trust's assets or the trust's business activities. Similarly, Robert contends that the use of Texas-based professionals who worked on behalf of the trust is a legally insufficient basis to find jurisdiction.

## C. Robert's contacts are more than a scintilla of evidence for purposeful availment

After a review of Marsha's evidence, we find it is legally sufficient to support the trial court's exercise of personal jurisdiction over Robert. First, we acknowledge the significant role that the Texas properties play in this dispute. When it established *International Shoe* as the standard for all assertions of jurisdiction for *in rem* actions, the United States Supreme Court in *Shaffer v. Heitner* observed the following:

> [T]he presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction. In such cases, the defendant's claim to property located in the State would normally indicate that he expected to benefit from the State's protection of his interest.

*Shaffer*, 433 U.S. at 207. The Court specifically noted the interest of a forum in "the marketability of property within its borders," "providing a procedure for peaceful resolution of disputes about

14

the possession of that property" and the reality that "important records and witnesses will be found in the State." *Id*. at 208.

The Court's observation rings particularly true here. This trust had 21 Texas income-producing properties. Their aggregate value was in the tens of millions of dollars. The properties required the services of a property management firm to collect rents, undertake maintenance, and handle the day-to-day tasks inherent with commercial real estate. Because Robert wanted to be involved in their disposition, he asked to receive an ongoing stream of information for the properties. The income generated by the properties further required accounting advice for quarterly tax obligations, here provided to Robert by a Texas CPA. And when many of the properties were sold (at Robert's urging), the beneficiaries only enjoyed the fruits of those sales under the benefits and protection of Texas law.

To be sure, Robert's ownership interest in Texas property was only equitable and resulted from decisions made by the settlors and trustees. Which brings us to Robert's core argument: as a passive trust beneficiary, he cannot be deemed to have contacts in a jurisdiction where the trust happens to own property. Owning an equitable interest in the trust property alone is insufficient to confer jurisdiction when an interested person[5] assumes only a passive role in the trust's administration. *Johnson*, 285 S.W.3d at 903 (finding no jurisdiction over passive beneficiary of trust).

In *Johnson*, the former owner of a foreclosed property located in Texas asserted claims against a trust and its beneficiary; the property had been transferred to the trust after foreclosure. *Id.* at 897–98. The trust beneficiary resided in Iowa and filed a special appearance, which the trial

---

[5] The Texas Property Code defines "[i]nterested person" as "a trustee, beneficiary, or any other person having an interest in or a claim against the trust or any person who is affected by the administration of the trust." Tex. Prop. Code Ann. § 111.004 (7).

court denied. *Id.* at 898. On appeal, the Dallas Court of Appeals reversed, holding that the beneficiary of the trust did not purposefully avail himself of the Texas forum. *Id.* at 904. The only jurisdictional allegation against the beneficiary was that he was, for a short time, the equitable owner of the property through his status as the trust's beneficiary. *Id.* at 900. The trust beneficiary's affidavit (which was unrebutted) proved he acted as a passive investor of the trust by entrusting funds to the trustee, relying on the trustee's knowledge and experience to invest those funds in real estate. *Id.* The fact that the trustee unilaterally chose to invest those funds in property located in Texas did not demonstrate purposeful availment of the Texas forum by the beneficiary. *Id.* at 901.

Additionally, the beneficiary in *Johnson* stated that the location of the property was immaterial to him and "purely fortuitous," which the court understood to mean that the beneficiary had no influence on the trustee's decision to invest in Texas property. *Id.* at 902. Finally, although the beneficiary was bound to reap some financial benefit from his interest in the property, the court reasoned this fact was only a corollary to the fact that the trustee, not the beneficiary, had chosen to Texas investment property. *Id.* at 903 (citing *Michiana*, 168 S.W.3d at 788) ("financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State"). Thus, the court reasoned that, as a passive investor, the beneficiary had not established minimum contacts with Texas. *Id.* at 903–904.[6]

---

[6] *Johnson* parts ways from some states where the *situs* of the trust administration within the state is in and of itself sufficient to confer jurisdiction over a beneficiary. *See Kaufman v. Barbiero*, 2013 IL App (1st) 132068, ¶ 1, 999 N.E.2d 764, 765 (2013) ("[B]y itself, an interest in a trust administered in Illinois may qualify as 'minimum contacts' with the State of Illinois, such that the due process clause is not offended by haling a nonresident defendant into court here concerning that trust.").

16

Yet when interested parties take an active role in the trust's affairs with the knowledge that their actions will create continuing obligations towards Texas residents, those parties are subject to personal jurisdiction in Texas. *See Alexander*, 2021 WL 970760, at *6. In *Alexander*, a Texas trustee of a trust, that was settled and administered in Texas and held property in the state for the benefit of Texan beneficiaries, appointed five Louisiana residents as co-trustees. *Id.* at 1. Each of the co-trustees signed documents accepting their positions as co-trustees in Louisiana though they knew the primary beneficiary of the trust was a Texas resident. *Id.* The co-trustees traveled to Texas to discuss trust business, spoke to the Texan trustee over the phone about the trust administration, and received compensation for their duties. *Id.* The Texas beneficiary sued the Texas trustee and her Louisiana co-trustees for breach of fiduciary duties; the Louisiana co-trustees filed a special appearance, which was denied. *Id.* at 2. On appeal, the court affirmed, reasoning that by making these Texas contacts, the trustees "reached out beyond Louisiana to create continuing relationships and obligations with citizens of Texas." *Id.* at 6.

Here, Marsha's evidence is legally sufficient to show that Robert assumed an active role in managing the trust's assets. For example, for 18 months, Robert kept in continuous communication with the trust's Texas-based property manager, Investar, and the trust's tax advisor, J.M. Trippon & Co., receiving information about the financial health of the Texas trust assets. Robert attended two in-person meetings in Texas to discuss the trust's administration, analyze its assets, and make additional requests for information from the trust's Texas-based professionals. *Cf. Alexander*, 2021 WL 970760, at *3–4 (finding co-trustees subject to jurisdiction where they visited Texas to discuss the administration of the trust); *Touradji v. Beach Captial P'ship, L.P.*, 316 S.W.3d 15 (Tex. App.— Houston [1st] 2010) (finding purposeful availment where nonresident defendant indirectly managed a Texas limited partnership through 10 phone calls to and from Texas discussing the

17

ongoing business of the Texas partnership and visiting Texas five times for business purposes). While Robert minimizes the Texas visit by arguing his primary purpose was to attend his father's funeral, that explanation does nothing to refute the fact that he purposefully engaged in these contacts in Texas. *See Moncrief Oil Intern. Inc.*, 414 S.W.3d at 147 (remarking "what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts" where defendant, accused of misappropriating trade secrets from a Texas business during a meeting in Texas, stated that its primary purpose at the meeting was to discuss unrelated matters).

More importantly, Robert attempted to insert himself into the trust's management such that there is some evidence he was more than a passive beneficiary. We recite some examples from the many emails between Robert, Marsha, and the property management and CPA firm: By June 2022, Robert and Marsha were are at odds over the 21 properties. Robert wanted them sold while Marsha wanted to keep some as part of her distribution. Marsha also wanted to keep the proceeds from those properties that were sold in the bank until the estate tax liability was settled; Robert wanted a more immediate distribution. And Marsha wanted to refinance three of the properties; Robert's response on this issue was clear: "I hereby put you on notice that I do not consent to any refinance, encumbering or restructuring of any trust B assets. Until we have a clear cut plan on how to pay the taxes and distribute the assets you do not have my approval."[7] Though not the trustee, he wrote Marsha, "We need to sell and close escrow on over 20 million dollars of property ASAP . . . Immediately list ALL properties for sale."

By July 2022, Robert complained that Marsha had kept him in the dark and requested she send "a DETAILED plan of how you intend to proceed." Marsha responded that the Texas

---

[7] He had, however, "verbally agreed" with Marsha over the sale of the Village Green property for $9.3 million dollars and the Southwest Business Center property for $3.25 million.

professionals would do a market analysis on each of the properties and added "[b]efore listing any property we will confer with you and get your input." By early August, the estate was facing $15 to $20 million dollars in estate tax liabilities. The Texas accountant recommended a tax deferral payment strategy to which Robert wrote Marsha that he was "TOTALLY opposed[.]" In the same email, he wrote Marsha she was "ok to proceed" with the sale of the "Vance Jackson" property (which in fact closed for over $1.5 million dollars).[8] By late August, Marsha proposed that she would keep 6 of the 21 Texas properties, and would pay Robert $10,786,786 for his share of the equity in them. Robert responded that he would retain the Texas properties and pay Marsha $11,150,000 for her equity. During this time frame, Robert objected to Marsha having "illegally appropriate[d] over $450,000 of Trust assets," and demanded that she "Please immediately distribute an equal amount to me." As these negotiations continued, Robert asked the Texas accountant to prepare balance sheets for each of the properties based on the current appraisals.

In September 2022, Marsha and Robert were still at odds over refinancing some of the Texas properties. When Marsha asked if Robert agreed to refinancing the properties, with the proceeds used to buy his share, Robert responded:

Please read my email . . . No . . . . I am NOT in agreement with the way you proposed

READ MY EMAIL

In leu of that

---

[8] Later in August, the Texas CPA sent Robert an email outlining the terms for the sale of the San Pedro property ($6.25 million) and Bandera property ($3.4 million), to which Robert responded "these offers are certainly acceptable." Robert also gave his approval to proceed with the sale of a Wendy's property and to "proceed as needed" with what appears to be the sale of another property.

I stated very clearly that I want you to IMMEDIATELY distribute 80% of the remaining TRUST B assets

If I can make it more clear for you . . . please ask

Robert

The Texas CPA wrote to Robert on the sale of two specific Texas properties, West Oak and Grand Avenue. One of those Texas properties was owned 50% by the trust, with the other 50% held by Indio Associates, LLC, a company that Robert, Marsha, and a third person owned. The sale closed, but only with Indio's participation, and Robert's input on a proposed change that would have allowed Indio's owners to preserve the 1031 exchange right. In rejecting the proposed change, Robert instructed the CPA: "I believe given the current situation the escrows should immediately be closed as per the original agreement." Interspersed in many of these communications are explicit references to Robert securing counsel, being damaged by Marsha's actions, and threatening litigation against Marsha.[9]

The tenor of the parties' dealings fared no better in 2023. In February, Robert emailed Marsha stating, "I hereby demand that you immediately distribute to me 50% of the monthly NOI from operations and 50% of the interest income from cash in the Raymond James account." That same day, he repeated his several "demands:" "Immediately distribute to me 4.5 million dollars in cash," "Immediately begin distributions of the monthly operating income," and "Negotiate an agreement to timely distribute all remaining trust assets."

This series of communications, of which we only selectively quote, constitutes some evidence to show that Robert was more than a passive beneficiary of a trust. *Cf. Johnson*, 285

---

[9] Robert accused Marsha various times of self-dealing, prioritizing her interests over his, and ignoring his pleas to distribute the trust property to him. Robert filed a petition against the trust in a California court, which apparently involves the same issues in this case.

S.W.3d at 901 (noting that the beneficiary had no input on how his investment funds would be used, let alone on the purchase of Texas real estate). The trial court could have fairly considered how Robert's requests had some influence over the plans to distribute the trust. For example, after Robert demanded all trust properties be sold to fund his cash distribution, Marsha responded: "Robert, per your request, we will be listing and selling the majority of the properties." Robert eventually reaped some financial benefit from Trust B: a distribution in the amount of $3,000,000, and another in the amount of $600,000. *See Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 75–76 (Tex. 2016) (suggesting that if a nonresident defendant sought to acquire Texas assets, it would "develop a link with the Texas market from which it could profit" and justify the exercise of jurisdiction). Collectively, these contacts are legally sufficient to show Robert purposefully availed himself of the Texas forum: he inserted himself in the distribution plans of Trust B's property to obtain a benefit, advantage, or profit from transactions or conveyances of Texas real estate.

We find Robert's counter arguments unavailing. His reliance on *Johnson* is misplaced given the factual distinctions in the case. Unlike *Johnson*, where the beneficiary allowed the trustee to invest in Texas property without his input or approval, Robert actively involved himself in decisions on the trust property by making offers on Texas properties, proposing plans to divide the property between he and Marsha, and demanding the immediate distributions of trust assets under the threat of litigation. He also approved the sale of several Texas properties when he was informed about those offers. *Cf. Retamco Operating, Inc.*, 278 S.W.3d at 340 (noting the defendant was a "willing participant in a transaction with an affiliated Texas company to purchase Texas real property"). None of these actions appear to be the actions of a "passive" beneficiary. *See Johnson*, 285 S.W.3d at 903–04 ("[W]e do not hold that a nonresident trust beneficiary's equitable interest in Texas real estate can never constitute minimum contacts.").

21

Another of Robert's attacks on the legal sufficiency of the evidence asks us to discount the volume of his communications concerning Trust B matters. "When communications between a nonresident and a resident are alleged as the basis for jurisdiction, we look to the quality and nature of the communications to establish purposeful availment." *Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 560 (Tex. 2018); *see also Michelin N. Am., Inc. v. De Santiago*, 584 S.W.3d 114, 137 (Tex. App.—El Paso 2018, pet. dism'd) (refusing mechanical application of any rule considering the fact-intensive nature of the jurisdictional analysis). But even aside from the number of communications, we find some evidence that the substance of the communications demonstrate Robert was more than a passive player in winding up the trust. He emailed the trust's Texas-based agents seeking information—balance sheets, income and expense statements— pertaining to Texas real estate owned by the trust, admittedly for ensuring an equitable division of the trust's Texas assets. In other words, Robert engaged the business of Texas property managers and accountants to help him make informed decisions about how best to divide Texas property in which he owned an equitable interest. Likewise, his communications with Marsha were intended to realize an agreeable distribution of the trust's Texas assets. [10] The substance of his communications, therefore, evince an intent to benefit from the distribution of Texas real property.

Lastly, Robert argues the Fourth Court of Appeals' decision in *McLean v. Paradigm*, 2023 WL 7133438, at *1–2 controls this case. *McLean* arose from a dispute over the failed efforts of Texas residents to buy a military tank from Poland in a deal brokered by a Pennsylvania resident. *Id*. The court held the nonresident defendants lacked minimum contacts with Texas, as they did

---

[10] Robert highlights that Marsha herself is a California resident. That Marsha, as trustee holding the legal authority to administer a trust which holds Texas property, is a California resident is beside the point: Robert, through his emails, clearly intended the effects of his conduct would be realized in Texas. He cannot now use the trustee's residence to avoid his purposeful availment of the Texas forum. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984) (stating plaintiff need not have minimum contacts with the forum state).

not engage in any marketing, advertising, or solicitations in Texas; did not generally solicit business in Texas or solicit the plaintiff in Texas; and did not agree to perform the contract in Texas. *Id.* at 5–7. The court also reasoned that, as a matter of law, the defendant's communications with the plaintiff (after the parties' execution of the contract) were insufficient minimum contacts with the state of Texas. *Id.* at 6. This case is thus rooted in the sale of property *not* located in Texas to Texas residents. Its analog to an out-of-state trust beneficiary influencing the disposition of Texas trust assets is dubious at best. The parties here are actively dealing in the distribution of Texas property in which they own an equitable interest. *See Retamco Operating, Inc.*, 278 S.W.3d at 340 (recognizing the benefits accompanying ownership of Texas real property). The trust has already sold millions of dollars of Texas property and the parties are actively disputing the disposition of similarly-valued Texas properties. Robert's demands, whether generated from Indonesia or elsewhere, are directed at Texas with a direct effect in Texas.

For the above reasons, we find the evidence is legally sufficient to confer jurisdiction over Robert.

**D.  Connection between the defendant, the forum, and the litigation**

Robert's contacts with Texas must also be sufficiently related to the litigation. *See Potkovick v. Reg'l Ventures, Inc.*, 904 S.W.2d 846, 847 (Tex. App.—Eastland 1995, no writ) ("We conclude that mere ownership of the real property alone is insufficient to bestow *in personam* jurisdiction: the ownership of the real property must be the subject of the underlying suit."). This case arises out of the parties' inability to agree on a plan to realize an appropriate and equitable distribution of a trust's Texas property. Robert sought to influence the sale and distribution of Texas assets to beneficiaries of the trust. Additionally, Robert's demands and criticism of Marsha's performance as trustee are tied to the declaratory relief that Marsha now seeks. He accused Marsha

23

of ignoring his interests and withholding information. Accordingly, some claims for declaratory relief enumerated in Marsha's petition are a request for the court to approve her actions as trustee and an accounting of the trust.

While Robert characterizes this case as one that solely pertains to Marsha's performance as a trustee, we find that the underlying controversy is actually about the administration of a trust holding Texas property and how that property ultimately should be distributed. *See Rattner v. Contos*, 293 S.W.3d 655, 661 (Tex. App.—San Antonio 2009, no pet.) (rejecting nonresident defendant's characterization of the case as a "business dispute" between two Californian residents, who entered a business relationship to deal in Texas property, where the defendant's alleged liability was substantially connected to how that Texas property had been held, managed, developed, or sold). Texas courts have similarly held that, when ownership of property in the state is the basis for jurisdiction, jurisdiction exists if the property is the subject of the underlying litigation. S*ee also Williams v. Pichichero*, No. 04-06-00211-CV, 2006 WL 2263909, at *5 (Tex. App.—San Antonio Aug. 9, 2006, no pet.) ("A nonresident's ownership of real property in Texas is a sufficient basis for jurisdiction over the nonresident when the ownership of the real property is the subject of the underlying suit.").

### E. The exercise of jurisdiction is consistent with fair play and substantial justice.

Having found that Robert made purposeful minimum contacts with the forum, we finally consider whether the court's exercise of jurisdiction offends "traditional notions of fair play and substantial justice." *See Retamco*, 278 S.W.3d at 341. A nonresident defendant has the burden to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Guardian Royal Exch. Assur, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991), quoting *Burger King*, 471 U.S. at 477. In making this determination, we consider

24

the following factors: "(1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies." *Moncrief Oil Intern. Inc.*, 414 S.W.3d at 155. Only in exceptional cases, where minimum contacts are established, will the exercise of jurisdiction offend traditional notions of fair play and substantial justice. *Id.* This is not one of those cases.

In his reply brief, Robert focuses on the second factor: the interest of the forum. He points out that the trust agreement was executed in California by then-California residents, John and Janet Hooten. The trust also names California law as its governing law and was administered in California for the first 17 years of its existence. The trust is now administered by Marsha, a California resident. On these bases, Robert believes California, not Texas, is the appropriate forum for this litigation. While California may have an interest in entertaining litigation over a trust that was executed within the state, this does not negate Texas's strong interest in resolving disputes concerning Texas land that has been managed in Texas with the help of Texas agents for roughly two decades. *See Retamco Operating, Inc.*, 278 S.W.3d at 342 ("Texas has an interest in resolving controversies involving real property within its borders . . . . [and] California has much less of an interest in resolving Texas real property disputes than does Texas.").

Looking to the first factor—the burden on the defendant—we do not discount the travel burdens for an Indonesian resident, but the burden is one of whether Robert must travel to California or Texas. Moreover, some evidence in the record reflects that Robert has already shown his ability to manage affairs in Texas. He was the trustee and beneficiary of a different trust that held Texas property. One email contains Robert's own admission that he derives almost all his

income from Texas. He owned several Texas properties. For many years, Robert also carried on extended contacts with the Texas property management firm and accountants in order to derive income from, and eventually sell, those assets. We conclude that Robert has failed to show how defending this action in Texas offends traditional notions of fair play and substantial justice. *See Yujie Ren v. ANU Res., Inc.*, 502 S.W.3d 840, 852 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding that a defendant failed to show that the burden of imposing jurisdiction on him was *unreasonable* considering, among other things, that the defendant had traveled to Texas from China more than once).

## IV. CONCLUSION

We conclude that there is some evidence to support the trial court's order below and that Robert is subject to personal jurisdiction in Texas. We affirm the order below and remand the case.

JEFF ALLEY, Chief Justice

September 16, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

26